**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **DESTINY CANO,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **HARLANDALE INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |
| **Defendant.** | § | |

**PLAINTIFFS' FIRST ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Destiny Cano ("Plaintiff" herein), and files this her *First Original Complaint* against the Harlandale Independent School District (the "School District") and proceeds as follows:

## I. NATURE AND STAGE OF THE PROCEEDINGS

1.     On or about January 17, 2017 while Ms. Cano was a student at the Harlandale Independent School District, she was participating in an excessively dangerous performance and was severely and permanently injured. Specifically, she suffered a spinal cervical strain, concussion, neck pain, neck sprain and post-concussion syndrome. A CAT scan showed that she had soft tissue swelling, while numerous x-rays showed neck spasms. Her concussion treatment, in addition to being painful, caused Destiny to miss weeks of school. Due to such injuries and the effects upon her thinking and ability to attend and participate in the regular educational environment, she satisfied standards to be considered a student with a disability.

2.     Notwithstanding this knowledge, the School District failed to fulfill their duty to assess her for special education services as contemplated by what is termed *child find* duties pursuant

to the *Individuals With Disabilities Education Act* ("IDEA"), 20 U.S.C. §1401 *et seq*. And provide services to her commensurate with her unique and individualized needs.  She filed what is termed a *Request For A Due Process Hearing* with the Texas Education Agency to have her concerns that the School District violated her rights under IDEA.  In addition, when filing her request for a *Due Process Hearing* Plaintiff additionally made allegations that the School District violated her rights pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, the Americans With Disabilities Act, 42 U.S.C. §12131 *et seq*. and the United States Constitution, pursuant to 42 U.S.C. §1983.  The School District argued that the Hearing Officer had no jurisdiction over such claims.  The Hearing Officer agreed and issued a finding on that matter accordingly.  In addition, the School District argued that Plaintiff had filed her request with the TEA outside the requisite statute of limitations.  The Hearing Officer and dismissed Plaintiff's claim pursuant to IDEA also.

3.      This action arises under the *Individuals with Disabilities Education Act* ("IDEA"), 20 U.S.C. §1401 *et seq*. It is an appeal of that decision by a Special Education Hearing Officer ("Hearing Officer") appointed by the Texas Education Agency ("TEA") who found that Plaintiff filed her request for a *Due Process Hearing* outside of the one-year limitations period set by 19 Tex. Admin. Code §89.1151( c) and 20 U.S.C. §1415(f)(3)(D).  The Hearing Officer's decision was contrary to the applicable law and was not supported by the facts and any and all reasonable inferences related thereto.  Further, the erroneous decision by the Hearing Officer foreclosed Plaintiff from having a hearing on the merits. The IDEA portion of the case should be remanded back to the TEA accordingly. In addition and in the alternative, the previously dismissed Section 504, ADA and Section 1983 claims are ripe for

adjudication.

## II.  JURISDICTION

4.      This action arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.
        § 1415(i)(2)(A); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794; the
        Americans With Disabilities Act, 42 U.S.C. §12131 *et seq*. and the United States
        Constitution, pursuant to 42 U.S.C. §1983 and jurisdiction is conferred upon this Court
        accordingly.

## III.  VENUE

5.      Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b).

## IV.  PARTIES

6.      Destiny Cano lives in Texas, and for the time pertinent to this case, was a student at the
        Harlandale Independent School District. She lives with her mother at 346 Stonewall, San
        Antonio, Texas 78214.

7.      The Harlandale Independent School District is a school district organized under the laws of
        the State of Texas. The School District may be served by and through its Superintendent, Mr.
        Rey Madrigal at 102 Genevieve, San Antonio, Texas 78214.    Nevertheless, Plaintiff
        reasonably believes the District will be represented by the Honorable Katie E. Payne and D.
        Craig Wood of Walsh, Gallegos, Trevino, Russo, and Kyle, P.C. at 100 N.E. Loop 410, Suite
        900, San Antonio, Texas 78216, who will accept service for the District.

## V. FACTUAL BACKGROUND

### A.      STANDARDS OF THE UNIVERSITY INTERSCHOLASTIC LEAGUE

8.      The University Interscholastic League (UIL) was created by The University of Texas at

Austin to provide leadership and guidance to public school debate and athletic teachers. The purpose of the UIL is to organize and properly supervise contests that assist in preparing students for citizenship. It aims to provide healthy, character building, educational activities carried out under rules providing for good sportsmanship and fair play for all participants.

9.     UIL Subchapter E, Section 21 enumerates the responsibilities of a school district's superintendent. Among other things, the superintendent of a member school district shall educate UIL student participants, coaches and other appropriate persons on UIL rules that could affect them, and monitor the school's compliance with UIL rules.

10.    Pursuant to Texas Education Code §33.204, a coach, trainer, or sponsor for an extracurricular athletic activity may not encourage or permit a student participating in the activity to engage in any unreasonably dangerous athletic technique that unnecessarily endangers the health of a student.   Additionally, there is a general danger of dance/tumble programs that is recognized by the National Center for Catastrophic Sport Injury Research ("NCCSIR").

11.    The NCCSIR documents the number and percentage of fatal, non-fatal and serious injuries every school year in high school and collegiate sports. For the purpose of definitions, fatal injuries result in death, non-fatal injuries result in a permanent severe functional disability and serious injuries do not result in a permanent functional disability.   According to the report noted above, from 1984-2016, there has been one fatal injury, twenty-seven (27) non-fatal injuries, and forty-two (42) serious injuries directly related to high school cheerleading.

**B.     ABOUT DESTINY CANO**

---

https://nccsir.unc.edu/files/2013/10/NCCSIR-34th-Annual-All-Sport-Report-1982_2016_Table-Appendix.pdf

12.     Destiny was born on July 20, 1999.  While at Harlandale High School she was on the dance team. Jayme Munoz was the lead coach of this team for two years.  In the weeks prior to January 17, 2017, Destiny and the dance team were practicing for a performance at an upcoming basketball game. Two weeks before the game, the team practiced the dance routine without any stunts.  As normal, the stunt was introduced closer to the date of the basketball game.

13.     Under Jayme Munoz's direction, the team began practicing what is termed "the trick" about a week before the basketball game. "The trick" refers to a dangerous stunt that another student tried to execute two years earlier. This student was unsuccessful and was injured with a concussion.  It is suspected that this stunt went against the prescribed rules for dance competitions. It would be considered "illegal" in a dance competition.  No one on the team could successfully execute the stunt, yet Destiny was given the charge to execute the stunt.

14.     Prior to the incident, Destiny was only able to practice the stunt five times. Of the five times, Destiny was only able to unsteadily land on her feet once. The other four incidents ended with minor injuries, because the team was able to use dance mats.  During one of the failed attempts, Destiny landed on her back. Another attempt resulted in her landing on her head.

15.     Male students at the School participating in football had the advantage of having full protective gear and equipment provided to them both for practice and games.

16.     Destiny and other female student-athletes did not have such a benefit.  Moreover, male students had a number of coaches and trainers skilled in providing emergency medical and nursing interventions. Destiny and other female student-athletes did not have such a benefit.

C.      INCIDENT IN QUESTION

17.   On or about January 17, 2017, Destiny was directed by dance coach Jayme Munoz to engage in the dangerous stunt without the dance mat they had been using. This made the stunt even more dangerous.  Destiny and the other girls on the team asked to put the mats down but Jayme Munoz refused.   It should be noted that other students had previously quit the dance team because of Jayme Munoz's teaching style. When students could not pull off a stunt, she would threaten the entire team with conditioning. She would also require the dance team to do extra laps anytime anyone complained.   At approximately 9:00 a.m., under Coach Munoz's direct orders, Destiny engaged in the dangerous stunt, as directed by Coach Munoz, and she fell and injured her head.

18.   Destiny reports that when she fell, she heard Coach Munoz say "guys, if y'all know that someone is gonna slip then you shouldn't do it". Coach Munoz shifted the blame on the dance team, even though she was the one who demanded the team perform the stunt.  Destiny rolled around on the floor, holding her head in pain.   When she began to cry, Coach Munoz told everyone to go to the locker room. Coach Munoz asked Destiny if she could move. Destiny replied that she could not move.  Coach Munoz then offered Destiny ice, which she accepted.  Coach Munoz asked Destiny if she could get up, and she replied that she could not get up.   Coach Munoz left Destiny on the dance floor for about twenty minutes before another student came and helped her go to the trainer.   While Destiny was being helped to the trainer, Coach Munoz sat in her office.   Destiny and the other student had to make multiple stops on their way to the trainer, because walking made Destiny dizzy.

19.   Destiny and the other student were then met by a teacher who instructed them to go to the nurse's office, which is located on the opposite side of the school.  Noticing the difficulty

with which Destiny walked, the same teacher decided to help walk her to the nurse's office. On their way to the nurses office they passed by many teachers and administrators who inquired about what was wrong, yet none offered to help her.   When she finally arrived at the nurse's office, the nurse gave her more ice but Destiny told the nurse that the ice was not helping anything. The school nurse decided to call someone to pick up Destiny.  On the third attempt, the nurse was able to make contact with Destiny's brother.

20.     Destiny was picked up from school after her brother was contacted. By the time Destiny's brother was contacted,  Destiny's head was pounding and her neck was in much more pain than before. Still, Destiny was not evaluated for a concussion or was EMS called.  Destiny did not receive any further contact from Coach Munoz until about 1:30 p.m. via text which read, "hey is everything okay. What happened?"

**D.      AFTER THE INCIDENT**

21.     When Destiny's mother picked her up from school, she took her to the urgent care doctor and quickly referred to an Emergency Room at a hospital.  When transported to the Emergency Room she was immediately put in a cervical collar.  Destiny was diagnosed with spinal cervical strain, a concussion, neck pain, neck sprain and post-concussion syndrome.   While in the hospital, she had a CT scan which showed soft tissue swelling.  Additional tests were performed on Destiny, such as flexion/extension spine film x-rays. The x-rays showed neck spasms (which is why Destiny's concussion has still not healed).    These tests were a significant cost to Destiny and her family.

22.     As a result of this injury, Destiny was seen by a sports doctor, Dr. Retting, approximately four times.   She also saw a neurosurgeon, Dr. Mancusso.  Since the incident, Destiny has

been to the emergency room a number of times. As a result of the injury, Destiny had to participate in  physical therapy two times a week for six weeks. The therapy involved heat, ultrasound/massage therapy and needling in the nerves.  She was also prescribed numerous medications for pain.

23.     Following the incident, Destiny's mother attempted to contact the school Principal to get an explanation on what happened. However, the school Principal failed to return any of Ms. Cano's phone calls, and instead had the school nurse contact her to answer any questions. Destiny missed over two weeks of school due to the concussion and need for treatment. After the end of the two weeks, Destiny was placed on what is termed "homebound status" for at least eight weeks by Dr. Mancusso, her neurosurgeon. The School District performed an evaluation on Destiny and determined that she had a physical and mental impairment, which limited her ability to concentrate and walk.

**E.     THE SCHOOL DISTRICT'S FAILURES**

24.     Due to the incident, Destiny had to receive immediate medical attention. Destiny and her family incurred medical expenses , which they still have, due to this incident that could have been prevented if the School District had properly trained their employees and provided emergency interventions in a timely manner.

25.     Even though the incident occurred in January of 2017, Destiny's mother was unable to meet with anyone from the School District until April of the same year.  All of her mother's attempts to speak with the Principal at Destiny's school failed. The District staff attempted to cover up the incident and failed to provide her information they otherwise had a duty to provide.  Instead, she was consistently referred to other people, including the Principal's

secretary, the school trainer and the school nurse, none of whom had the capacity to arrange for the accommodations Destiny needed.

26.     Moreover the District never assessed her for Special Education services even though she was clearly disabled and not able to function educationally without such services.  In fact, the only accommodation the School District offered Destiny was homebound services. This included a School official visiting Destiny at her home for approximately two hours twice a week. No teaching occurred during these sessions as the person sent was not even a teacher.

27.     In regard to other failures under IDEA the School District never provided the family notice regarding their procedural rights and safeguards under IDEA; or assessed Destiny for any necessary or related services; provided Destiny with transitional services; or communicate with Destiny's medical treatment providers in a collaborative manner and no special education service was performed or offered.  Not surprisingly Destiny continued to fall behind academically due to the School District's failures and was advised to accept a high school diploma, even though she could not complete the regular high school curriculum.

28.     Due to School District's failure to remedy the effects of the injuries and trauma Destiny experienced, Destiny continued to struggle academically and non-academically in University. The injury she acquired at Harlandale ISD continues to affect her ability to study, concentrate, retain and understand information so as to attend and benefit from college level classes and her vocational aspirations.

29.     The School District withheld information from Destiny and her family that they otherwise should have provided.   The School District failed to Destiny information about her due process rights, also known as *procedural safeguards* under the IDEA. Had it not been for the

failures of the Harlandale ISD, Destiny would not continue to suffer from an injury that could have been prevented.

## VI.  PROCEDURAL RESUME

A.    T.B.'s ORIGINAL REQUEST FOR A DUE PROCEEDING HEARING

30.    On or about June 26, 2018, within a year of her 18th birthday, Plaintiff filed a *Request For A Due Process Hearing* with the Texas Education Agency ("TEA") pursuant to the *Individuals With Disabilities Education Act*, 20 U.S.C. §1401 et seq., ("IDEA") to address the failure of the School District to address her then current educational needs. She additionally included claims that she was a victim of discrimination based upon disability, pursuant to Section 504 of the Rehabilitation Act of 1973, the Americans With Disabilities Act and also claims of violations of her rights under the United States Constitutional.  She also anticipated that the District might argue the Complaint was filed outside the one-year limitations period set at 19 T.A.C. §89.1151( c) and argued the applicability of a number of tolling theories.

31.    A Hearing Officer was appointed by the TEA. The School District responded with a *Plea to the Jurisdiction* as to non-IDEA claims, a *Motion to Dismiss* based upon statute of limitations and a general denial.  The Hearing Officer granted the *Plea to the Jurisdiction* dismissing all non-IDEA claims, i.e., the Section 504, ADA and Section 1983 claims without prejudice.   The limitations issue was set for briefing and argument.

B.    THE HEARING OFFICER DECISION

32.    The Hearing Officer determined that Plaintiff's IDEA claim fell outside the one-year limitations period.  The Hearing Officer also determined that the "known or should have

known" date for filing the request for a due process hearing, was April 14, 2017 when Destiny purportedly learned the District would not provide her Special Education services and that it should have been filed before April 4, 2018.  He rejected arguments that the District withheld information from Destiny they were otherwise required to provide. Additionally that what he characterized as *equitable tolling theories* were not applicable.  In regard to allegations of that the Destiny did not receive not receive notice of her procedural safeguards, individually and in concert with the other failures by the District, did not in any case rise to the level of denying the her the ability to filing a timely complaint. [DE# 4, p. 007, 009]. Destiny Cano appeals that decision.

33.   In addition she now file the following non-IDEA claims as they are ripe for adjudication.

## VII.  CLAIMS FOR RELIEF UNDER IDEA

34.   Petitioner incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

35.   The Hearing Officer wrongly concluded that Plaintiff did not meet her burden of proof on the applicability of the statute of limitations.   The Hearing Officer's findings of fact and conclusions of law with respect to the statute of limitations were legally erroneous and directly contrary to the evidence.  Plaintiff appeals that decision and it should be reversed and vacated by this Court and the IDEA portion of this case remanded back to the TEA accordingly.

## VIII. UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

36.   Plaintiff incorporates by reference all the above related paragraphs, as well as those below, above with the same force and effect as if herein set forth.

37.     Specifically, and at all times relevant hereto, Destiny possessed both a substantive and procedural due process right including, but not limited to, a liberty interest in her bodily integrity.

38.     The Texas Legislature has spoken repeatedly about their concerns student athletes are being put into dangerous situations by their teachers and coaches.  Notwithstanding the fact these concerns have been put in state law and related regulations and UIL Directives, this School District has apparently failed to train staff about these concerns and the laws,  regulations and directives related thereto.

39.     Moreover, during the relevant time period contemplated by this cause of action, the named staff with the School District Respondent did not follow the policies and procedures developed by their own School Board, in regard to the use of inherently dangerous exercises and drills. These failures evidence a lack of supervision by relevant School Officials.

40.     During the relevant time period contemplated by this cause of action, the named staff with the School District Respondent did not correctly follow the policies and procedures developed by their own School Board, in regard to responding to concussions and like medical emergencies. These failures also evidence a lack of supervision by relevant School Officials.

41.     Based upon the operative facts, such acts and omissions rise to the level violations of the Fourteenth Amendment of the Constitution of the United States, and for which Destiny, seeks recovery, also pursuant to 42 U.S.C. §1983.

## IX. PLAINTIFF'S CONSTITUTIONAL RIGHT TO MEDICAL CARE

42.     Plaintiff incorporates by reference all the above related paragraphs with the same force and

effect as if herein set forth.

43.   At all times pertinent hereto, each of the individuals named in the Complaint were acting in their capacity as coaches and/or trainers in the Respondent School District, and therefore acting under the color of the law. Their actions and inactions which caused Destiny's Constitutional deprivations are enforceable pursuant to 42 U.S.C. §1983.

44.   Each of the above-named staff were deliberately indifferent to the Plaintiff in that they knew Destiny faced a substantial risk of serious harm and they failed to take reasonable steps to avoid the harm once she exhibited symptoms of a concussion.

45.   Each of the above-named persons are directly responsible for this constitutional violation. Upon information and belief, the School District through either express policy or the inactions of their policy makers had a policy and/or practice of reckless indifference to the rights, health and safety of student athletes noted above, including and especially Destiny.

46.   This adopted practice, custom or policy is demonstrated by the fact that despite having suffered an obvious injury and having lost consciousness, Destiny was left to sit and was denied her right to receive adequate emergency and/or medical treatment.

47.   As a direct and proximate result of the Respondents' unconstitutional acts described above, Destiny sustained severe and grievous injuries as described and averred herein.

## X. CLAIMS PURSUANT TO THE EQUAL PROTECTION CLAUSE OF THE 14th AMENDMENT TO THE UNITED STATES CONSTITUTION

48.   Plaintiff incorporates by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

49.   The acts and omissions of the School District Respondent by treating Destiny different than male students and male athletes similarly situated discriminated against her *as a class-of-one*

thereby violating the *Equal Protection Clause* of the Fourteenth Amendment, for which for which Destiny seeks recovery pursuant to 42 U.S.C. §1983.

## XI.  CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT

50.   Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

51.   The School District is deemed a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

52.   Additionally, the School District provides a facility whose operation constitutes a program and services for ADA purposes. The facts as previously described demonstrate violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

53.   Once Destiny was injured, she qualified as a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) with her disabilities affecting her major life activities, including and especially her ability to think, walk and talk.

54.   Once Destiny was injured, she qualified as a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) with her disabilities affecting her major life activities, including her inability to attend public school.

55.   In regard to both the Respondent School District failed to satisfy the requisites of the ADA when not identifying Destiny as a student with a disability directly after her injury. Additionally, the School District refused to reasonably accommodate her disabilities and modify their services in violation of Title II of the ADA.

## XII.  CLAIMS PURSUANT TO THE REHABILITATION ACT OF 1973

56.   Plaintiff incorporates by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

57.   The Harlandale ISD receives federal funds and thus follow the requisites of Section 504 of

the Rehabilitation Act of 1973, 29 U.S.C. §794.

58.   The implementing regulations of Section 504 require that each state that receives

disbursements, including the state's political subdivisions such as local school districts, must

ensure all students with disabilities are given appropriate and necessary accommodations,

pursuant to federal law and rules. To the degree that a policy or practice hinders honest

consideration of a disabled student's unique and individualized needs, and fails to

accommodate that child's disability and keep the student safe, it violates Section 504.

59.   Petitioner further asserts the School District failed to provide Destiny such services and

accommodations, have when together and separately, contributed to violating her rights

pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto.

Likewise, and also in addition and in the alternative, Destiny was thus a victim of intentional

discrimination by the School District.

### XIII. CLAIMS FOR RELIEF PURSUANT TO TITLE IX

60.   Plaintiff incorporates by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

61.   Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as amended, 20

U.S.C. § 1681 *et seq.*, ("Title IX") specifically notes that a public entity may be liable under

Title IX for discrimination based upon gender or gender stereotypes. The claimant must be

a member of a protected class; must be treated differently because of  membership in that

class; the Respondent entity must be on notice as to the allegations; be deliberately

indifferent to those allegations and the victim must have experienced a deprivation of educational opportunities and/or other damages. Destiny easily satisfies all these threshold requirements.

## XIV. PROXIMATE CAUSE

62. Plaintiff incorporates by reference all allegations in the above- related paragraphs with the same force and effect as if herein set forth.

63. Each and every, all and singular of the foregoing acts and omissions, on the part of the Harlandale Independent School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XVI. RATIFICATION AND RESPONDEAT SUPERIOR

64. Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

65. The Harlandale ISD ratified the acts, omissions and customs of school district personnel and staff.  As a result, the Respondent is responsible for the acts and omissions of all school administrators, educators, personnel, staff and agents.

## XVII. DAMAGES

66. Plaintiff incorporates by reference all of the above-related paragraphs, as if fully set forth herein.

67. As a direct and proximate result of the Respondent's conduct, Plaintiff has suffered injuries and damages, which she may seek compensation thereby, all within the jurisdictional limits of this court, including but not limited to the following:

    a.      Deprivation of educational services;

b.      Deprivation of non-educational opportunities;

c.      Past physical disfiguration;

d.      Future physical disfiguration;

e.      Past medical expenses;

f.      Future medical expenses;

g.      Past mental anguish;

h.      Future mental anguish;

i.      Loss of opportunity;

j.      Loss of companionship;

k.      Loss of earning capacity; and

l.      Injury to reputation.

68.    By reason of the above, the subject of this lawsuit, Petitioner has suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

### VIII.  DEMAND FOR JURY TRIAL

69.    Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff demands a jury trial on all issues in this matter.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court receive the records of the administrative proceedings brought by Plaintiffs per the Petition as required by the IDEA and award Plaintiff the following relief; that in regard to the appeal of the IDEA claim, the Court enter a judgment reversing and vacating the Hearing Officer's decision and find that Plaintiffs

met their burden of proof regarding the statute of limitations, and remand this portion of the case

back to the TEA.   Additionally, Plaintiff prays in the manner and particulars set forth above and in

an amount of damages sufficient to fully and completely compensate her for the elements of damages

enumerated above, for judgment in favor of Plaintiff and against Defendant for damages, attorney

fees and costs for the preparation and prosecution of this cause of action and for appeal if required

together with pre-and post-judgment interest, costs and for such further relief as this Court may deem

just and proper in law and equity or both.

Respectfully submitted,
*/s/ Martin J. Cirkiel*
Martin J. Cirkiel, Attorney
State Bar No.: 00783829
marty@cirkielaw.com [Email]

Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

**ATTORNEYS FOR PLAINTIFFS**